United States Court of Appeals for the Fifth Circuit is now open according to law. God save the United States and this honorable court. Good morning counsel, I'm Judge Dennis together with Judge King and Judge Howell. Recording in progress. We'll be your panel today in this case United States of America versus U.S. but then they're ready. Gudipati, Eddow, there are five of you and you free a lot of your time so please stay within your time. That's been a lot to do because if you get off track I'm gonna call you down because we have other cases and other litigants to hear. So we've been very generous in allowing additional time but I want you to stay within it. We'll start with the first. Counsel is Brett Newton. It please the court, I represent Ravindra Reddy Gudipati, a longtime legitimate perfume wholesaler in Laredo who for many years sold perfume legally to Mexican clients in cash but convicted of becoming part of a money laundering conspiracy involving Mexican black market peso exchange beginning around 2012. On appeal we are challenging the sufficiency of the evidence of Gudipati's mens rea for the three money laundering convictions counts one, three, and six. We are not challenging the section 5324 convictions relating to his failure to report cash to the IRS. But section 5324 violations don't prove money laundering. To prove money laundering the government must prove two things beyond a reasonable doubt. First that Gudipati knowingly accepted drug money during financial transactions and secondly that he intended to conceal the money in those transactions for the benefit of those in the black market peso exchange. I've got very limited time so I'm going to cut to the chase about the three money laundering counts. Let's start with the earliest count three and the corresponding part of count one, the conspiracy count. There's no evidence and certainly not constitutionally sufficient evidence that Gudipati knew he was receiving drug money on August 12, 2012 or any time for that matter before the final transaction on October 16, 2013. The following parts of the record on appeal show this. Pages 4206 and 07 and page 4199 are the testimony of the informant Karina Blake who testified she did not use the term narco dinero during any of the three unrecorded transactions. The two recorded transactions before the final one government exhibits 177 and 248 certainly do not have her using narco dinero or any such terms. It's only in the final transaction on October 16, 2013 on page 3020 and 3021. The case agent agent Lozano testified she only used that term during the third or the sixth and final transaction on October 16, 2013. And then I want to point the court's attention to a very important passage in her testimony on page 4185 and 86 in which she Blake testifies quote. When the agents told me that I had to say it was dirty money, that it was narco money, I didn't do it the first few times because, as I remember, I was thinking that Mr. Ready, Gudipati was going to think it was very strange if I mentioned the word narco. It would not have seemed strange to Gudipati for Blake to use that term if he already understood he was receiving drug money. That is an admission by her that he did not know it was drug money before she said it was drug money. And that didn't happen until October 16, 2013. Therefore, at the very least, there is insufficient evidence of count three and the corresponding part of count one. Now, let's turn to count six, which concerns the final transaction on October 16, 2013 and the corresponding portion of count one. The conspiracy count, as noted, that was the first time narco dinero was mentioned. The record clearly shows that Mr. Gudipati was not a fluent or even a proficient Spanish speaker when the judge articulated for a case agent was on a on a spectrum from basic to fluent with proficient being in the middle. Where is he? The agent said he speaks basic enough Spanish to be able to get by selling perfume. Also very important is Karina Blake. The confidential informant said narco dinero is not part of his vocabulary. So there is not proof beyond a reason about even knew he was getting drug money. But let's assume that he was. Let's assume he was getting that he knew he was getting drug money. He didn't know it until October 16, 2013. Remember Blake's testimony that she said she held off from using that term because it would seem very strange to him because that's not a term. That would be normally used. Well, that shows that he could not have known it before then. Now, this is very important. The recording of the final transaction makes it crystal clear. It had been pre negotiated. It had been pre negotiated by Lulu, Blake's person she worked for in Mexico and Mr. Gudipati before she arrived with the nineteen thousand nine hundred dollars. That's a very important fact under this court's decision in the United States versus SESA. In that case, the court held that the mere knowing acceptance of drug proceeds does not prove money laundering because there is no intent where you have to have extra proof of intent to then conceal. And when you have pre negotiated a transaction that, as far as you know, doesn't involve drug trafficking proceeds, and then someone shows up when you're counting the money and says, oh, by the way, this is drug trafficking proceeds under SESA that cannot prove intent to conceal. Remember, the language of nineteen fifty six eight talks about transactions being involved in money laundering. The final transaction was a fait accompli at the time. If you believe he understood it at the time, he did understand it for the first time under SESA that shows insufficient evidence of his mens rea, even if he did know it was drug money for count six and the corresponding portion of count one. Therefore, there's insufficient evidence of count one. There's insufficient evidence of count three and there's insufficient evidence of count six. For that reason, the court should vacate those three convictions and remand for resentencing on the failure to report counts. At the very least, there's insufficient evidence of count three and the corresponding portion of count six, which takes out the bulk of the money for purposes of the sentencing guidelines. And there's not even a preponderance of the evidence that he knew it was drug money. So for these reasons, I asked the court to reverse those three convictions at the very least, reverse count three and the portion of count one and remand for resentencing. Thank you. Thank you, Mr. Layden. We're going to go to Angela Moore. Yes, ma'am, please. The court. I'm Angela Moore and I represent both Harsh and Nibru Jaggi in this cause. First, I want to tell this honorable court that I am comforted that we are here at the Fifth Circuit. Were we in state court in Texas, I would be very disturbed. However, we are before an excellent court who will read the entire record and review the law. I'm also comforted by the fact that we have excellent lawyers, not only on appeal, but at the trial court level, some of the best. So this court has an excellent record to rely on as well. Fortunately, we also had a very experienced, very good trial judge, Judge Marmolejo. Judge Marmolejo. So I believe this court can rule on this record very easily. What this case is about, as you all know, and I must say I speak slower than Mr. Newton. I'm from West Texas, so I can't quite speak that fast. But the standard of review on appeal for my clients is a de novo when we're looking at It's important for this panel to understand, and I know Judge Dennis and Judge King, I've argued before 20 years ago. I'm not familiar with Judge Ho, but I know both of you, Justices King and Dennis, and I'm sure Justice Ho, are very familiar with border culture. Sitting on the court you do and hearing the cases that you hear, border culture is a different world. It is a different type of community and business is conducted somewhat differently. This business of the Jaggies was a perfume business. They were a wholesaler. They normally sold to other individuals who sold perfume to other vendors. It's not unusual for this business to be conducted in cash transactions. You're at the border, and as the government goes into great detail, the peso dollar exchange is not illegal. It's what you are trying to conceal is, was it drug money? Was it part of an illegal activity? This sort of business is also conducted on credit. And so Jose Luis, which is a key player in regard to my clients, the Jaggies, he not was a long time client of theirs. He had always paid regularly in cash. They've never had trouble with him before. So there was no reason for the Jaggies to suspect that all of a sudden he was trading drug money. I'll get to Ms. Blake's testimony in a moment, the confidential source. So Jose Luis is the key. El Puma is the key for my clients. They knew he was a long time customer. He had paid regularly. And at this point in time, he was $524,000 in arrears. So the government places great weight on that, saying that that was an intentional incentive for the Jaggies to engage in unlawful activities so that they could get paid. The truth of the matter is they didn't get paid. They had to declare bankruptcy. They've lost everything. They did not profit from the situation at all. It's, excuse me. It's, I hope that wasn't me. It's obvious from the testimony, as we know, that Karina Blake was the confidential source. And all we have from her, which indicates harsh Jaggie and mirrored Jaggie, is the use of one word. And that's the word narc. Now, in the testimony from the agents questioning by the government, they talk about the word narco, N-A-R-C-O. That is not what is shown in the recording. It is the word narc, N-A-R-C. So that also weighs in the favor of my clients that Harsh did not understand what the word narc dinero meant. And in support of that assertion, I can point to points in the record. That is, Harsh raised questions with Karina Blake. She's talking to him and trying to get him to create a meeting of the minds to engage in this unlawful activity. The record shows that he had no interest in engaging in unlawful activity, nor did he really recognize that she was talking about illegal activity. He questioned her, well, why don't you get money orders? Why don't you wire the money? Jose Luis could wire the money to me. Was this money declared at the border? He asked her that. He told Ms. Blake he would not use a fake company to pay him. He said, if we're using, basically, he said, your freight company, Ms. Blake, I need the tax ID. These statements in this conversation show a clear intent not to engage in anything that seemed illegal or wouldn't pass muster. I also want to talk about some of the government's, well, the government alluding to certain facts in the record, which are a bit mischaracterized. The statements by Harsh and Nero about knowing what the word narc or nautical meant was several years after this incident. They were not talking about when this alleged crime was supposed to have occurred. When they said, sure, we understand what nautical means, according to the agent, this was several years after the fact. But the evidence shows at the time of this discussion with Blake, Harsh didn't know. Now, let's go to Nehru Jaggi. Mrs. Jaggi kept two sets of books. The government places great weight on the fact there were two sets of books, a close inspection of these books. What it shows is that one set of books is basically like attorneys we might make in our files, telephone calls, what the client said. The client said, I would be sending X amount of money to pay on my bill. These are notes of what's supposed to happen. The official ledger, as I'll call it, were the actual payments that occurred. Some of those payments may have been for other family members as part of a larger account. These are not two hidden books trying to conceal anything. And they're handwritten by Mrs. Jaggi in a way that she could understand to keep her record straight. Buma Jose Luis would promise to send a large amount of money. In fact, in one instance, he had Ms. Blake bring a lot of money and then he took money back. So they could never count on Buma's word that this is exactly the amount I'm sending. This is how much you're going to get paid because it varied day to day. Now, there's important evidence I need to point to about an undercover agent saying Nehru Jaggi approached him right away in the store. Of course, she did. They're there to sell to customers. That's not unusual. They do that in most stores because they want your business. She was not blocking the doorway to their perfume store. She was telling customers to come in. Anyone familiar with shopping in Laredo or at border stores know that it's common to stand in the doorway, pasale, adelante, come in. They want to sell to you. Another fact that the government's relying on is that Nehru overheard this conversation in which there were the word narco used. She was 40 or 50 feet away. There's no way she understood this. Her discussions with Blake were they needed to get paid. Jose Luis was really far behind. They needed to get paid. Lastly, I want to talk about the tax forms. Several facts were mischaracterized by the government. Most importantly, the accountant is the one who faxed those records in to the IRS, the forms, the 8300 forms. He testified that he had not gone over that you needed the courier and the ultimate customer until after this alleged transaction, much later. He did not explain that to them before they had filed these forms. Most importantly, on every form they had filed, they had done it the same way. It was a consistent mistake. So, that lends itself to the fact that Mrs. Jaggi and Mr. Jaggi had no intent to hide anything. They may have been filling out the form inaccurately because that's how they understood it, but it was for every customer, not just Jose Luis and not just with Ms. Blake. I see I have 10 seconds left. I will add that to my rebuttal remarks if possible, but I, without waiving any issues or facts, I'll rely on our briefs. Yeah. Mr. Valle, you're up. Mr. Roberto Valle. Yes, good afternoon. My name is Roberto Valle. I represent Luis Montes Patiño. The question before the court today regarding Mr. Montes Patiño is whether the district court abused its discretion in applying Rule 43. In other words, did the court abuse its discretion in making a determination that Mr. Montes Patiño voluntarily absented himself from sentencing, which would have effectively waived his right to be present at the sentencing hearing? And there's some important facts regarding this that I'd like to address. First, Mr. Montes Patiño, after trial, it's a record that he was reporting to pretrial services and did participate in his PSR interview. And in fact, he was reporting up to close to the time of sentencing. And so when the court set the first sentencing hearing in May of 2020, I'm sorry, of 2019, Mr. Montes Patiño, the court asked about where he was and they asked pretrial, they asked defense counsel, and the only indication was that nobody knew where he was. There was two more hearings, including the final sentencing hearing and another hearing in between. And during those hearings, nobody specifically could say where Mr. Montes Patiño was, although the marshal service did indicate that they did talk to a family member who said they believed that he could be in Mexico when they interviewed him, but not during the time of sentencing or not at sentencing. The marshal service, in fact, said that they had no record of his return from Mexico, but they also did not say they had any record of him actually going to Mexico. So we don't know if that's where he went, but that was the indication of the marshal service that he may have gone to Mexico, which given the circumstances and facts in this case, had he gone to Mexico, according to his own testimony, there were people who were dangerous and that he was in danger. So if he had gone to Mexico, it wouldn't be surprising if he didn't return for sentencing. But we don't know that. The government did, they supplied the court with several cases from different circuits. Robinson involved someone who actually escaped from custody, unlike Mr. Montes Patiño. Also, Jordan from the 11th Circuit also involved an escape from custody. And then there was a 9th Circuit case, Ornella. And in that case, a person on pretrial release, Ornella, his house was raided by DEA during pretrial release. And then from there, nobody saw him after that raid where drugs were found. Then the government also cited a 5th Circuit unpublished opinion case, which would be facts more similar to this case. And in all those cases were cited by the government, the findings were that they had voluntarily absconded. We did cite a case to the court, the Del Valle opinion. We'd like the court to look at that. And, you know, everything is in our brief. And so I've got nothing further for the court unless the court has any questions. Okay, we'll move on to Mr. Uribe. Yes, may it please the court. I represent Adrian Arciniega Hernandez. Mr. Arciniega was convicted of money laundering, conspiracy, and we're challenging that count on the basis of insufficient evidence. And he was also convicted of two substantive money laundering counts. And he was convicted of those pursuant to a Pinkerton instruction because the government stipulated that there was no evidence that he directly participated in any of those charges. And so the jury went ahead and convicted him on the basis of the conspiracy count. And we're challenging those on the basis of the Fifth Amendment that the district court's instruction to the jury was a constructive amendment of the indictment in violation of the Fifth Amendment. The operative case with respect to the conspiracy charge is the Cesar case, which was mentioned previously. The holding, and in particular, the horse trainer in that case, Eusebio Huitron, had the same issue, was a concealment money laundering conspiracy that was reversed by this court. And it's our contention, it's my contention that my client, Mr. Arciniega, stands in an even greater position than the horse trainer in that case. And so it should be reversed as well. The operative rule in Cesar was whether or not the defendant had knowledge of the inner workings of the black market of the conspiracy or was extensively involved in it. The evidence against my client, which he pretty much was a courier in this matter, he just, for the most part, handled, delivered, and received cash bundles. Other evidence that the government argued was that he used code words, that he referred to one of the actors in this matter referred to as Tio Polo as his boss, that he expressed concern over somebody else, Rita Molina, on how she was going to defend herself, and a discussion of commission rates. And it's our contention that that evidence does not meet the rule of Cesar, which shows any evidence of the extensive involvement in the conspiracy or the inner workings of it. And it's also noteworthy in the Cesar case that with respect to the horse trainer, the words kilos were used, and this court determined that that discussion of code words was not sufficient, and the same should hold true for this case as well. Also, if one looks at the record for the commission rates that were discussed that the government was arguing was probative, if one looks at that, that was in connection with trucks as well, and so it looks like it appears that we're talking about legitimate business of transport, which he worked as a shipping manager. And so the argument is that when one applies the rule of Cesar, the evidence is clearly insufficient that my client did not join the conspiracy. And my client is further removed in the horse trainer because we throw on directly dealt with a drug cartel, and we don't have that situation with my client. He was an employee of Carlos Velazquez and Gabriel Castillo, who were defendants in this case, and they're the ones that had direct dealings with the drug trafficking organization and not my client. He basically took orders as an employee to transport and to do the things that he did, and that just cannot rise to the level of the rule of Cesar, where you need more evidence than just the bare transaction. And I want to make this point very clear because in page nine of the government's brief, they describe the general conspiracy, and they say for their participation, couriers receive a percentage of the transaction. And there's absolutely no evidence that my client made a dime separate and apart from his salary as a worker in this case, so he was just basically doing his job. And so that even goes against how the government describes the conspiracy, and with respect to the, and if the court reverses the conspiracy, that should take care of the whole case. In light of the government stipulation, because once the conspiracy charge goes, the substantive counts cannot control. And I refer to my brief furthermore for the arguments that the instruction that the court gave on the substantive count is a violation of the Fifth Amendment. And it is a, and this is an issue of first impression on constitutional grounds that it should be reversed, that it was a constructive amendment of the indictment in violation of my client's Fifth Amendment rights. Thank you, Mr. Uribe. Thank you. Mr. Panda for the government. Good afternoon, your honors, and may it please the court, Josh Handel for the United States. Unless the court prefers otherwise, I'll plan to spend the majority of my argument addressing the sufficiency challenges, and then I'm happy to take questions about any other issues. So, at the outset, it's undisputed here that a transnational drug trafficking organization was in fact operating a black market peso exchange through Laredo, Texas. That this money laundering operation was being orchestrated by a peso broker in Mexico, who went by the moniker of Tio Polo, and that the operation was using at least two perfume businesses, Ravinder Gudipati's Nysa Impacts and Harshan Niru Jaggi's El Reno, to launder the proceeds of drug sales from elsewhere in the United States. So, with that background in mind, there are three relevant questions bearing on the defendant's convictions. Mr. Handel, can I ask you a question? Absolutely, Judge King. Run through for me a typical transaction that the record shows was involved here, because I've sort of gotten lost in the weeds. I hate to say, but I am lost in the weeds. So, just run through exactly how this thing worked. Sure, absolutely. So, kind of at a high level, what happens here is the purpose of a black market peso exchange is for a drug trafficking organization to take its dirty cash, its drug proceeds from sales in the United States, convert that into clean products that it buys at import, export businesses, and then move those products across the border. And those products are then converted into clean pesos. And so, that's kind of the laundering cycle that we have going on here. With respect to the specific transactions that are at issue in this case, I'm happy to walk through those. But let me ask a question. This will just further reveal my ignorance, which I might say is not from lack of effort. But if they picked up, let's say, cash from Oklahoma City from the sale of drugs, all right, they take that cash. Where? Where does it go? Sure. So, a courier would presumably pick up that cash from actual drug traffickers or drug merchants in Oklahoma City. They would bring it down to the border. There may be multiple couriers involved. So, we see this specifically with respect to Mr. Arciniega Hernandez, where there are a couple of links in the chain, some drop-offs in parking lots at midnight and things like that. But then that courier eventually brings it down to the border community, where it is brought, in this case by Ms. Blake, into either Mr. Gudipati's business or the Joggy's business and put toward the accounts of the Mexican importers. All right. So, the money gets to Laredo or wherever and it's brought to this business and it's put into the accounts of who or what? Right. So, this money is brought. You know, we have trial evidence that it's brought in bags of, you know, tens of thousands of dollars, rubber banded together. Big bags, right. Right. And Ms. Blake then represents to, for example, to Mr. Gudipati. This is bulk currency transaction eight that occurred in June of, or I'm sorry, bulk currency transaction 10 that occurred in August of 2012. She represents that this is $30,000 that is being paid on behalf of Puma for products that are going across the border to Puma or to Lulu, who are the two Mexican importers involved in this case. All right. So, what happens there when you're talking about, the money gets brought, it's brought into this shop or store. And then what happens again? I'm sorry. No, no, it's okay. This is a complicated factual scenario. So, what happens is the business owner accepts the money. And in this case, these business owners accepted the money as payment for products, either that they were going to ship across the border or products that had already been shipped as they're accepting. It may be prepayment or as payment for perfume. That's correct. Yes. Yep. The perfume then gets shipped across the border and it goes down and it arrives at Lulu's business or Puma's business and they sell the perfume. And, you know, that's a, I mean, that sliver of it is a legitimate transaction where they are selling the perfume and getting clean pesos. Okay. Then what happens to the clean pesos? The clean pesos go to the drug trafficking organization that had arranged for the dirty money to come down and pay for it. Yes. All right. I've got it. Sorry. No, no, no worries. So, you know, kind of getting back to, you know, what the government had to prove here and what it proved to the jury. I would say there are three relevant questions bearing on the defendant's convictions. Number one, did they know that they were receiving the proceeds of unlawful activity? Number two, did they agree to accept those proceeds anyway? And number three, did they share in the purpose of either concealing the source or nature of those proceeds or avoiding reporting requirements? The jury answered yes to all three questions. And because the trial evidence robustly supports that determination, this court should affirm the convictions. So turning first to Mr. Gudipati, the jury had ample evidence from which it could infer Mr. Gudipati's knowledge that the money he received from the Mexican importers through Karina Blake was the product of unlawful activity. The jury heard from Mr. Gudipati himself that when he started his business, the two Mexican importers relevant to this case, Puma and Lulu, would either come into his store to deliver payment in person or they would send payments through a nearby Casa de Cambio, which is a legitimate currency exchange establishment. The jury heard that those practices changed around October 2011 when Karina Blake began delivering bags full of tens of thousands of dollars cash in small denominations wrapped in rubber bands. And under this court's precedence, that kind of evidence is alone sufficient to support the jury's inference that Mr. Gudipati knew he was handling illicit funds. As you said in United States versus Hughes, which we cited on page 50 of our brief, a recipient's knowledge can be inferred from the circumstances surrounding the transfer and handling of the money, including the fact that he accepted significant sums and small bills in bags. And that's exactly what we have here. But on top of that suspect course of conduct, the jury also heard that Mr. Gudipati never once identified Ms. Blake, the money courier delivering this cash, on any transaction reporting form, despite the fact that by his own admission, he understood the separate parts of a Form 8300. And again, by his own admission, he correctly filled out a different Form 8300 when money was dropped off by a third party other than Ms. Blake. And of course, the jury heard that Mr. Gudipati did not react negatively or with surprise when Ms. Blake reminded him on October 16, 2013, that what she had been bringing him and brought to him that day was narco dinero, drug money, and that he didn't file a transaction report at all for that nearly $20,000 delivery. So taken either singularly or in concert, that evidence supports a rational inference that Mr. Gudipati understood the illicit nature of the funds delivered to his business during this conspiracy. The evidence was likewise more than sufficient for the jury to have rationally inferred that Mr. Gudipati conspired with his Mexican importer counterparts and with Ms. Blake before she became a government informant to launder this money. Mr. Gudipati argued in his brief that at most he could have conspired with Ms. Blake, who was a government informant for a part of the time that they were interacting in this conspiracy and thus could not qualify as a co-conspirator during that period. But that contention is inconsistent with the record. It was apparent to Mr. Gudipati at all times that Ms. Blake was acting as an intermediary for the two Mexican importers implicated in this case, Lula and Puma, Lulu and Puma, excuse me. He has never contested that relationship. And in fact, he relied on it when he was explaining why he listed only the importer's names and not Ms. Blake's on his disclosure forms. The jury also heard evidence that Mr. Gudipati continued to arrange cash deliveries from Lulu and Puma through Ms. Blake throughout the course of this conspiracy. So for example, during one recorded delivery from Ms. Blake, Mr. Gudipati called Lulu to confirm that Ms. Blake had delivered $50,000 and then laughed and joked with Ms. Blake later in that same recorded conversation about not putting her name down on the transaction report. So just as the evidence established Mr. Gudipati's knowledge that Ms. Blake was delivering illicit funds, it was also sufficient to establish that Mr. Gudipati knew that Ms. Blake was acting on behalf of Puma and Lulu, and that Mr. Gudipati had agreed with them to accept those illicit funds. So we have Mr. Gudipati's knowledge that he was accepting illicit funds. We have his agreement to do so. And the final piece of this puzzle is purpose. Whether Mr. Gudipati understood and shared in the conspiracy's purpose of concealing the source of this money or avoiding reporting requirements. And here I think Mr. Gudipati's consistent misrepresentation of these transactions to the government on his form 8300 is compelling evidence that he was intent on concealing the nature of the payments and shielding them from detection. The jury heard testimony from Ms. Blake that Mr. Gudipati agreed not to include her name on any of the transaction reports at her behest. And in fact, the jury received recordings of Mr. Gudipati reassuring Ms. Blake that he would not identify her despite knowing his obligation to do so. In another recorded call, Ms. Blake told Mr. Gudipati that her transporting money put her quote at risk with the police end quote. This is at record page 7994. But Mr. Gudipati told Ms. Blake that he would continue to accept large cash deposits from her despite his observation to her that the IRS is in all of Laredo and they're watching closely. And that's, I think, what ultimately differentiates Mr. Gudipati's case from, for example, the defendant in United States versus CESA, the horse trainer there, who knowingly received drug proceeds in exchange for legitimate services, but made no other apparent efforts at the behest of the drug trafficking organization to conceal the movement of that money. Here, Mr. Gudipati discussed, agreed to, and carried out steps to conceal the movement of drug money through his business and into Mexico. And that evidence was sufficient to convict him. Turning to the Joggies, Harsh and Nehru Joggy, the evidence there likewise amply supports the Joggies active, knowing, and deliberate participation in this money laundering conspiracy. The jury heard that the Joggies, like Mr. Gudipati, began accepting bags containing tens of thousands of dollars cash in small denominations wrapped in rubber bands from Ms. Blake in 2011. And they understood her to be acting as PUMA's agent. The jury also heard that the Joggies never once identified Ms. Blake on a transaction reporting form. And in fact, typically did not file transaction reports for Ms. Blake's deliveries at all. And that's despite the fact that their accountant testified that he explained the transaction reporting process in detail to them. Despite the fact that both of them told investigators they were familiar with the Form 8300 reporting requirement. And despite the fact that they told investigators, they always identified the person bringing in the money on their transaction reports. In fact, among the bulk currency transactions relevant to El Reno, the Joggies business, the Joggies amassed over $190,000 across a half dozen deliveries between March 2012 and May 2013, each of which was well over $10,000 apiece. And on only one of those occasions did they file a transaction report. On the one Form 8300 that they filed in August of 2012, they underreported the amount received by $20,000 and again, withheld the courier's name. And just speaking of that August 2012 episode, the jury also heard testimony from DEA Special Agent Alfonso Perez that he went to El Reno that day to observe Ms. Blake's drop-off, but was blocked from the store. That as soon as he entered, Nehru Joggy immediately approached him and escorted him out of the entry within 15 to 20 seconds. And of course, the jury heard that the Joggies, much like Mr. Gudipati, did not react negatively when Ms. Blake flatly stated to them on May 8th, 2013, that the money was, quote, nothing but narco money, end quote. And that they proceeded to accept the $30,000 she delivered that day, provided her with personal receipt, and didn't file a transaction report. When they were asked later by investigators, Harsh admitted that he knew what narco money was, and Nehru also correctly identified it as drug money. The jury also heard that Harsh discussed ways that Ms. Blake could effectively evade identification and reporting requirements, suggesting that she bring in multiple low-denomination money orders of under $3,000, which is the reporting threshold for money orders, and enlist other people to structure deposits below $10,000. And of course, it heard that Nehru Joggy kept two sets of books, which is a classic money laundering move, and provided receipts to Ms. Blake for bringing in large amounts of cash while simultaneously falsifying the corresponding transaction forms or failing to report the transactions altogether. And finally, the jury also heard that the Joggies lied repeatedly once they were caught. Both of them denied knowing Karina Blake, despite their numerous recorded interactions with her. And in fact, both of them denied that they had ever accepted money from anyone but their direct customers. So that constellation of evidence was more than sufficient to sustain the jury's finding that the Joggies understood that they were accepting illicit proceeds, understood that those providing them the illicit proceeds, i.e., Puma acting through Ms. Blake, did not want them accurately reporting those payments to the government, and agreed to accept them money and conceal the transactions under those conditions. And finally, abundant evidence supported Mr. Arseniega-Hernandez's knowing, active, and willful participation in this conspiracy as well. So first of all, we have ample evidence that Mr. Arseniega-Hernandez knew he was transporting illicit funds. The jury heard that Mr. Arseniega-Hernandez is routinely meeting up in random parking lots, sometimes in the middle of the night, for handoffs of bags containing huge amounts of cash. $80,000 on one occasion, $67,000 on another, $58,000 on another. The jury heard from a government expert witness that cash drop-offs in random parking lots in amounts of money that are in denominations of less than $100 is a, quote, telltale sign that there is money laundering going on. Moreover, the jury heard that Mr. Arseniega-Hernandez used a variety of code words to refer to the money that he was moving. And I know my friend on the other side mentioned that the isolated use of one code word was held insufficient in CESA. But in that case, it was a code word that was spoken to the defendant. Here we have multiple conversations in April of 2012, in March of 2013, where Mr. Arseniega-Hernandez is himself using code words. He is referring to money as documents. He calls it a car one time. He calls it a regalito, a little gift. He refers to it as lotion on another occasion. We have the fact that Mr. Arseniega-Hernandez lied to police when he was intercepted with $58,000 from a controlled delivery. He tells them first that he doesn't know anything about the money, and only later that it's actually meant to be brought to his boss at the warehouse. So taken together, that evidence demonstrates that Mr. Arseniega-Hernandez understands that he is trafficking in the proceeds of unlawful activity. And that we also know that he evinces knowledge of the inner workings of this conspiracy. He isn't a mere driver, a mere transporter, as was the case in the Trejo decision from a few years ago. Mr. Arseniega-Hernandez repeatedly refers to Teopolo as his boss. And that's telling because of what we and what the jury knew about Teopolo's role in the conspiracy. Agent Lozano identified Teopolo as the peso broker who stood atop this operation and interacted, interfaced directly with the cartels and with drug traffickers. Ms. Blake also testifies that she repeatedly received instructions from Teopolo. So he's a big deal in this conspiracy, and he's repeatedly on calls with Mr. Arseniega-Hernandez discussing details of cash deliveries. Finally, not only is Mr. Arseniega-Hernandez transporting bulk cash, but Ms. Blake testifies... I'm sorry. Excuse me, your honors. Mr. Bali has dropped off. I'm not sure if you all want to continue or want me to try to get him on while the argument goes on? I think we just go on. I don't know where... Okay. Maybe he was... Who knows? Okay, we'll get him in the background. Go ahead. Sure. So just the final point on Mr. Arseniega-Hernandez, not only is he transporting this bulk cash, but Ms. Blake testifies that he's also involved in counting it out. He's involved in separating it. He's involved in marking it for delivery and making sure that the right cash goes to the right places. He understands that Teopolo is atop this operation. He understands that this cash is destined for stores, for businesses along the border. And I would submit that that is ample, ample evidence from which the jury could have inferred that Mr. Arseniega-Hernandez not only knowingly trafficked in illicit proceeds, but also understood the workings of this conspiracy and joined in its purposes. I'm happy to address the Pinkerton instruction or any of the sentencing issues, but I don't want to belabor the points if there are no further questions. I think we got it. All right. Well, thank you very much. We'll rest on our brief and I respectfully request that you affirm the judgments below. Thank you. Thank you, Ms. Amick. We will now take up the rebuttal time for each defendant, starting with Mr. Nunez. Thank you. You have two minutes on rebuttal. Thank you. I have two points I want to make. Number one, the Hughes case, which the government cites, radically different case. That did not involve a cash business, which the perfume business selling to Mexican merchants does. So it's not shady to get money in cash. It's not shady to get money in small amounts. And when we say small amounts, 5, 10, 20s, as opposed to hundreds. Something to remember, Corina Blake testified herself, page 3757 through 3758, that she did not figure out there was anything wrong with this when she began delivering the money for several months. She did not understand this for several months, and she was the one working directly with the peso book. So it's certainly understandable that Mr. Guccipatti would not think anything. Being brought different amounts of cash in different denominations does not prove that you know you're getting drug money. Second point, yes, he did not report Corina Blake. He is not appealing the issue about the reporting. You need to look at the November 2012 recorded transaction in which he explains why he did not report Corina Blake. It was because he feared IRS scrutiny, not DEA scrutiny. He said explicitly, the reason I don't want to report you, and she asked him not to be reported, by the way. But he said, I don't want to report you because it's not going to match who's actually paying me the money, and I don't want the IRS involved. In other words, he feared that if the courier was the one listed, but the courier wasn't the one reporting a 1099, then that's going to cause the IRS to look. That's not about money laundering and drug dealing. That's about a violation of 5324. Again, we're not appealing that issue. We're appealing the mens rea issue of whether he knew he was getting drug money and whether, like the defendant in CESA, the government proved beyond a reasonable doubt that he intended to conceal drug. Thank you, Mr. Lieberman. Ms. Moore, you have five minutes on the bill. Thank you, Your Honor. Briefly, I just want to address some, again, mischaracterization of some facts regarding my clients. The government relies significantly on statements that they made, again, years later when they were taken into custody or at least questioned by the agents. They did not have a translator. These are years later. They did not say they didn't know Corrina Blakely. They didn't recognize her from a photograph. Also, regarding the cash money, as Mr. Newton's talked about, that's not unusual in this business and it's certainly not unusual at the border. As far as the rubber bands, again, that's not unusual. This is money that the customer with the Jaggies, Jose Luis, is paying on his account. Again, Nehru did not list the courier for any of her customers, not just Jose Luis, and nothing's alleged on these other customers. They're only being charged with Jose Luis. That bears significantly on the lack of intent. As far as the bags of money being brought in, there's no evidence to suggest that bringing cash in large amounts was unusual in this business. It wasn't. I believe it was Nehru and Harsh who testified that they dealt in cash and they were paid in large sums. I also want to point out that the government argues on August 12, 2012, that that was a Jaggies did not report on a Form 8300. I believe that was an error, as we argue in our brief, because Mrs. Jaggie also filed 8300 forms on amounts where she didn't have to file them. On smaller amounts, she still filed Forms 8300. Lastly, for my last few moments here, I want to address sentencing. I realized that was not addressed in my opening, but if the court will indulge me, may I talk about sentencing? Okay, thank you. The problem with my clients is a bit more unique than the other appellants. My clients were sentenced by a judge who did not understand the most complex facts of this complex case. Mr. Mike McCrum basically discussed the facts with Judge Alvarez, the sentencing judge, who did not sit through 18 days of trial and even admitted that she knew enough facts, but had not reviewed everything. I should note, I have three drawers in my file cabinet, which are all Jaggie records. There's no way even the most brilliant individual could absorb all this information in approximately two weeks. How it harmed my clients is Mr. McCrum objected. He also argued his points regarding the PSR and why there should be a variance and why the bump of eight points should not have applied to my clients. And in those discussions with the trial court, with all due respect, Judge Alvarez got it wrong. She stated that when Harsh was discussing, you should bring money orders. Why don't you just wire the money? Did you declare it at the bridge? That Judge Alvarez understood that to be discussed in the context of a fake business paying him. There's nothing to suggest that in the record. Yet, the trial court and counsel disagreed significantly on that point. For my last few seconds, I'll argue harm. My clients later on when Judge Marmolejo was assigned the case were given compassionate release and their sentence was reduced to time served. They were in the prison for approximately 18 months on an eight year sentence. They were under house arrest for six months, which they have served. So the harm is they've lost everything. They've also had to live under house arrest. They also will be deported unless this case results in an acquittal. And for the facts that we've shown, we rely on our brief and all matters and ask that this case be reversed. Thank you, Ms. Boone. Mr. Handel, you have two minutes on the vote. You understand what's about it? Mr. Handel, you have two minutes on the vote. Your Honor, Mr. Handel did not address any of the issues. There's really nothing to rebut. And so I have nothing further to report. Yes, Your Honor. The couple of points I want to make, Mr. Handel made a point about the cash bundles that my client transported, handled, and received. If the court looked to the Supreme Court case of Cuellar and the Trejo case of this circuit, it specifically dealt with people that were hired to transport money. And both those cases reversed the money laundering conspiracy cases. And they said that just the mere transporting of it is not enough. And regarding the reference to the expert that was made by the government, that's not what this court looks to. What this court looks to is the precedent and the rules that they're guided by. And clearly, the rule is under CESA, whether my client had extensive knowledge of the conspiracy or knowledge of the inner workings. And being a courier, no matter how much you go back and forth, according to the law of the Fifth Circuit and the Supreme Court, that's not enough. And none of the evidence that's been cited is sufficient. And with respect to the horse trainer, whether he actually said it or not is immaterial. The point is he understood it. He understood what was meant by that code word. And this court determined that is not enough. We need more evidence in order to satisfy what needs to be proved by the government to prove a conspiracy. And if you look at the Trejo case, they lied to the police initially, just like my client. And so I asked the court to look at the case law, look at the briefs. And my client should be reversed on appeal. Thank you, Mr. Yergey. Thank you, counsel, for staying within your time limits. Recording stopped. Pardon? This case will be submitted. And we will take the next case for the day.